LAUREN I. SCHOLNICK (Utah Bar No. 7776)
**STRINDBERG SCHOLNICK BIRCH**
**HALLAM HALSTAD THORNE**
40 South 600 East
Salt Lake City, Utah 84106
Telephone:     801.359.4169
Facsimile:      801.359.4313
Email: lauren@utahjobjustice.com

Julia Elmaleh-Sachs (admitted pro hac vice)
Susan K. Crumiller (admitted pro hac vice)
**Crumiller P.C.**
16 Court St., Ste 2500
Brooklyn, NY 11241
Telephone:     212.390.8480
julia@crumiller.com
susan@crumiller.com

*Attorneys for Plaintiffs*

---

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| LARA SILVERMAN, PhD and JEFFREY POOLE, <br><br> Plaintiffs, <br><br> -against- <br><br> DISCGENICS, INC., <br><br> Defendant. | **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **Case No. 22-CV-354-JNP-DAO** |

Plaintiffs Lara Silverman and Jeffrey Poole, by their attorneys, Crumiller, P.C., as and for

their complaint against DiscGenics, Inc., allege as follows, upon information and belief:

## PRELIMINARY STATEMENT

1.        Dr. Christopher Duntsch, i.e., Dr. Death, is well known in the United States for allegedly

killing and/or injuring 33 neurosurgery patients in the Dallas-Fort Worth Metroplex. Duntsch is

currently incarcerated in Huntsville, Texas for injuring an elderly person in connection with a botched surgery, serving a life sentence.

2.      Duntsch's nightmarish medical career has been the subject of a television drama series starring Alec Baldwin, Christian Slater, Joshua Jackson and AnnaSophia Robb, as well as a true crime documentary series and podcast. However, many do not know that before Duntsch rose to infamy as a failed neurosurgeon, he founded DiscGenics, a clinical stage biopharmaceutical company that develops cell-based therapies for patients suffering back pain due to degenerative disc disease. In 2011, when Duntsch was removed as a board member and Chief Science Officer in the midst of a financial dispute with former DiscGenics executives, he left in his wake a company fraught with unlawful sexual harassment, gender and pregnancy discrimination, and a workplace culture that is perhaps best described as a nightmare for women.

3.      Dr. Lara Silverman first became a victim of this sexist and sexualized work environment when she joined DiscGenics in 2011 to replace Duntsch. A daughter of immigrant parents who fled communist Romania as refugees, Silverman was taught from a young age that the only path to success was determination and hard work. She went on to receive her bachelor's degree from Princeton University and then graduated from the University of Pennsylvania with a master's and PhD in medical engineering; she was the highest-ranking scientist at DiscGenics. Unfortunately, even with such impressive credentials and a breadth of scientific responsibilities, Silverman was not shielded from the pervasive sexism at DiscGenics, where all five members of the board of directors are men, and where there has never been a woman on the executive team or board.



*The Current Executive Team and Board of Directors at DiscGenics Led by Flagg Flanagan, CEO, Middle*

4.    In fact, *because* of Silverman's academic achievements and high-level position, she was often – if not always – the prime victim of the all-male C-suite's sex-based hostility. While the examples are too numerous to list, some notable instances include:

- When Silverman was pregnant with her first child, at a company-wide meeting, CEO Flagg Flanagan conspicuously pointed to Silverman's pregnant belly with a grimace and declared to the entire room, "how is she going to do her job now?"
- After having her first child, Silverman was not provided a proper lactation space and was instead forced to pump breast milk in closets and bathrooms at the office for four months.
- In early 2015, during Silverman's second pregnancy, Flanagan approached Silverman in her office and informed her that he was going to set up a "transition plan" for her to exit the company because she "now had two children" and therefore, he "assumed [she] would no longer be able to do her job."
- In 2016, at a work dinner with Silverman and COO Bob Wynalek, Flanagan told a story about a female patient who underwent neck surgery and was later found in the recovery room performing oral sex on her husband. Wynalek laughed at this story in delight and commented that she was a "loyal wife" and was "doing her job."
- Flanagan often shared anecdotes about his sex life with his wife to DiscGenics employees. On one occasion, he joked about wanting to be cremated and asking someone to throw his ashes into his wife's face so he "could get one last blow job" from her. Another time, Flanagan entered the main conference room at the office and announced to the staff that he was "much more relaxed today" because his wife had returned from a trip and "taken care of him" the night before.
- Male employees commented in a joking manner that because all the conference rooms were named after mountains, the pumping room should be called the "Grand Tetons."
- During a private discussion between Flanagan and the CFO, Flanagan remarked that Silverman had gone "bat shit crazy" from her hormones when she was pregnant.

5.      Moreover, beginning in 2013, Silverman repeatedly requested that her title be changed to Chief Science Officer to accurately reflect her experience level and job duties as the highest-ranking scientist in the company. For the remainder of her tenure, Flanagan and Wynalek refused to correct her title, maintaining that she did not "deserve" the promotion and that the company did not "need" a CSO. However, the previous person to hold the CSO role at DiscGenics was Duntsch, even though he had no prior business experience or real-world scientific experience beyond his PhD.

6.      It is difficult to comprehend how a man with no practical scientific experience who would later go on to become one of the world's worst neurosurgeons could somehow be deserving of the title of CSO, while a woman with multiple advanced degrees in medical engineering — who spent years successfully doing her job as the highest-ranking scientist in the company — was not.

7.      In 2020, Jeffrey Poole was hired as DiscGenics' CFO. At the time, he also took on the lion's share of human resources responsibilities at the company, given that there had not been anyone in an HR role for the majority of Silverman's tenure. Quickly realizing that Poole wanted to change the sexually charged and misogynistic work environment at DiscGenics, Silverman confided in him; she told him about all the revolting comments that she and other women had been subjected to over the last decade, and she also shared that she had been asking for and had been denied a well-deserved promotion to CSO since 2013.

8.      Poole was disturbed by Silverman's account. Soon after starting at the company, he realized that Silverman's reports of a sexist work environment were accurate. Poole felt that the existing work culture was untenable and would put the company's reputation and scientific achievements at risk if steps were not taken immediately to fix it.

9.      Eventually, both Poole and Silverman complained to the DiscGenics Board of Directors about the longstanding sexist work environment at the company, providing a plethora of anecdotes and evidence. One board director told them in response to their complaints that the company would 1) add a woman to the board, and 2) give Silverman a long-deserved promotion. Neither of these actions were taken.

10.     Instead, DiscGenics retaliated against Poole and Silverman, first by abruptly terminating Poole in violation of his employment agreement, and soon after, by placing Silverman on a sham performance improvement plan because the company viewed her complaints of discrimination as a "lobbying effort" to be promoted to CSO.

11.     The company also conducted a charade of an "investigation" into Silverman's complaints of discrimination, interviewing just seven men and two women, both of whom had close ties to Flanagan. Neither Silverman nor Poole were interviewed as part of this purported "investigation." When asked about company leadership, the investigation revealed that "female employees declined to comment on discomfort with casual conversation of leadership." Predictably, the company chose to interpret these responses as a conclusion that no discrimination had taken place.

12.     In a letter to Silverman provided by HR, Flanagan admitted to "engag[ing] in locker room banter" and telling "some inappropriate jokes" while denying most of the specific allegations that Silverman had made against him. The letter did not address his failure to promote Silverman to CSO, nor the adverse actions that both Poole and Silverman had suffered in open retaliation for their complaints of gender discrimination. After receiving this letter, the company continued to retaliate against Silverman by stripping away her job responsibilities and excluding her from crucial meetings.

13.     Unable to emotionally withstand the sexist abuse any longer, and realizing that the company had no intention of redressing her complaints of discrimination and retaliation, Silverman felt she had no choice but to resign. Her last day was July 1, 2021. She was one of eleven women who left the company between November 2020 and November 2021.

14.     To this day, there has never been a single woman on the board or in executive leadership at DiscGenics, and Flanagan remains in his CEO role as the company continues to seek funding from outside investors.

15.     Silverman and Poole now bring this action against DiscGenics to remedy claims of gender discrimination and retaliation in violation of state and federal antidiscrimination statutes.

**PARTIES**

16.     Plaintiff Silverman is an individual residing in Salt Lake City, Utah. She was formerly employed by DiscGenics as its Senior Director of Research and Development ("R&D").

17.     Plaintiff Poole is an individual residing in Salt Lake City, Utah. He was formerly employed by DiscGenics as the Chief Financial Officer and Head of HR.

18.     Defendant DiscGenics is a privately held biopharmaceutical corporation with its principal place of business at 5940 Harold Gatty Drive, Salt Lake City, Utah, 84116.

**JURISDICTION**

19.     Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331, as Plaintiffs have asserted claims that arise under federal laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

20.     Venue is proper in the District of Utah, Central Division, pursuant to 29 U.S.C. § 1391,

because DiscGenics has an office in this District and a substantial part of the events or omissions

on which the claims asserted herein are based occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

21.     On July 30, 2021, Poole filed a timely Charge of Discrimination ("Charge") with the

Utah Antidiscrimination and Labor Division ("UALD").

22.     On August 6, 2021, Silverman filed a timely Charge with the UALD.

23.     On March 24, 2022, Silverman and Poole were issued their Notices of Right to Sue by

the U.S. Equal Employment Opportunity Commission.

## FACTUAL ALLEGATIONS

### *General Background on the Company*

24.     DiscGenics is a biopharmaceutical start-up company founded in 2006 and funded by over

$71 million raised to date in venture capital.

25.     DiscGenics focuses on developing regenerative cell-based therapies to treat lower back

pain; primarily, an injectable disc cell therapy ("IDCT"). IDCT is a liquid that is frozen in a

special lab at -196 degrees Fahrenheit. The liquid has cells suspended in it and right before it is

used, it is thawed and then transferred to a syringe so that it can be injected into the body.

26.     The founder of DiscGenics, Christopher Duntsch, is commonly known for his depiction

in the podcast series *Dr. Death* (and subsequent Peacock television dramatization starring Alec

Baldwin, Christian Slater, Joshua Jackson and AnnaSophia Robb).

27.     In or around 2005, Duntsch discovered the work of two Russian stem cell scientists,

Valery Kukekov and Tatyana Ignatova, who produced a technique for culturing stem cells of

intervertebral discs outside the body. In 2006, he sought a patent for their technique and founded DiscGenics.

28.     In 2011, after a financial dispute with DiscGenics, Duntsch was removed from the board and from his position as CSO. A former neurosurgeon, between 2011 and 2013, Duntsch worked at three different hospitals in the Dallas-Fort Worth Metroplex and operated on 37 patients, 33 of whom he injured or killed.

29.     In 2017, Duntsch was sentenced to life in prison for one count of causing serious bodily injury to an elderly person.

30.     When Duntsch left DiscGenics in 2011, it employed approximately 5 people. At the beginning of 2021, DiscGenics employed more than 30 individuals.

*DiscGenics' Leadership*

31.     DiscGenics' executive leadership team consists of three individuals who also sit on the five-person board of directors of the company. These five people are all men. In its fifteen years, DiscGenics has never appointed a woman to its board of directors, nor has it employed a woman in any executive-level position.

32.     Since 2010, Flagg Flanagan has been the CEO and Chairman of the Board of Directors of DiscGenics. From 1996 to 1998, he took an Owner/ President Management Program at Harvard Business School. In the early 1980s, he founded Flanagan Instruments, a neurosurgical device distribution business, and sold it to Itochu International twenty-five years later. Flanagan is also on the boards of True Digital Systems, Peloton Medical, Triad Life Sciences, Steribite, and the Neurosurgery Research & Education Foundation. He is the main spokesperson for DiscGenics and meets with investors, doctors, and global company representatives on a weekly basis. The rest of the executive team and board report to him directly, such that he indirectly oversees the

entire staff. Flanagan is the sole strategic decisionmaker at DiscGenics even though he does not have a scientific background (other than in sales) or any advanced educational degrees.

33.     Bob Wynalek is the Chief Operating and Commercialization Officer ("COO") and a board director at DiscGenics. As COO, Wynalek is responsible for the operational and commercialization strategy and execution of the company. Before joining DiscGenics in 2010, Wynalek served as President of Osteotech, Inc., where he oversaw development, regulatory clearance, and commercialization of numerous biologic devices for bone healing. Currently, Wynalek also serves as a committee member for the Alliance for Regenerative Medicine and BioUtah. At DiscGenics, all non-clinical employees with the title of "Director" or "Senior Director" report to Wynalek directly; he oversees the R&D, Manufacturing, Engineering and Operations teams.

34.     As the CEO and COO, Flanagan and Wynalek are the two highest-level executives and board directors at DiscGenics. They have been close friends and worked in orthopedic devices sales together for many years.

35.     Dr. Kevin Foley serves as Chief Medical Officer and a board director at DiscGenics. He earned his MD at the University of California, Los Angeles. Foley is responsible for the inventions of many surgical devices and techniques that have revolutionized minimally invasive spine surgery and receives royalties – in 2021 he was paid $18.3 million – for his inventions from companies such as Medtronic (a medical device company that is one of the world's leaders in spinal and musculoskeletal therapies). Foley is also the Chairman of Semmes-Murphy Neurologic & Spine Institute and is a tenured professor of neurosurgery, orthopedic surgery, and biomedical engineering at the University of Tennessee. Foley is a close personal friend of Flanagan and was Duntsch's supervisor during his fellowship at the Semmes-Murphey Clinic in

Memphis. While he is technically the CMO and "oversees" the clinical department at DiscGenics, in actuality he is a figurehead board member who works full time as a neurosurgeon in Memphis caring for patients.

36.     Dr. Najeeb Thomas joined as the fourth board director of DiscGenics in August 2020. He is not part of the executive leadership team. Thomas is a neurosurgeon who practices at Southern Brain and Spine in New Orleans, Louisiana, where he focuses on treatment of degenerative diseases of the spine. Thomas completed training under Foley with whom he remains close personal friends; he is also close friends with Flanagan.

37.     These four men are well known (and Foley and Thomas are well regarded) throughout the biotech industry, especially in the fields of neurosurgery and medical devices that focus on the treatment of spinal degenerative diseases.

38.     The fifth board director of DiscGenics is Colin Novick, who joined the board along with Thomas in August 2020. He was originally a paid consultant for DiscGenics in Japan and was selected by Dr. Yoshinori Shirono, founder of Ci:z Investment LLP, DiscGenics' Series C lead investor, to represent his interests on the DiscGenics Board.

39.     DiscGenics has recently reported interim data from its Phase I/II Clinical trial and plans to submit its full dataset to the U.S. FDA's Office of Tissues and Therapies (OTAT) later this year. It currently employs about 25-30 people, mainly focused on R&D, but in spring of 2022 had job postings for approximately10 more, including manufacturing, suggesting that it intends to work toward commercialization of the product in the future

40.     As with most startup companies, DiscGenics employees were passionate about their objective, namely treating lower back pain by exploring new scientific treatments. Cell therapy is an exciting, cutting-edge field and the DiscGenics staff was excited to contribute to novel

scientific successes and find groundbreaking ways to treat back pin. Throughout Silverman's

tenure, much of the staff worked in cubicles or in the lab space, including Silverman. Foley and

Thomas only came to the office for board meetings every few years, but Flanagan kept them

closely apprised of any notable milestones.

### Lara Silverman Joins DiscGenics

41.     Silverman is a first-generation American and the daughter of refugees who fled from

communist Romania to the United States in 1977. Silverman's parents taught her and her sister

from an early age that studying and education was the only path to success. As a child,

Silverman had a strong affinity for science and technology and excelled in her studies.

42.     In 2006, Silverman graduated from Princeton University with a Bachelor of Science in

Engineering, Chemical Engineering. After a year of working for a mid-size consulting firm,

Silverman returned to graduate school at University of Pennsylvania where she obtained a

Master of Science in Engineering: Medical Engineering in 2008. From 2008-2011, Silverman

earned her PhD in Philosophy: Medical Engineering at UPenn.

43.     In 2011, Silverman began working part-time as a Scientific and IP Consultant for

DiscGenics. She provided input on how to manage the existing patent portfolio and also began to

develop material for the IDCT product. As an employee in the R&D department, she reported to

Wynalek.

44.     On March 19, 2012, the company hired Silverman as a full time Project Manager and

Engineer. She was essentially hired to replace Duntsch as the top scientist at the company. She

continued to report to Wynalek, though it became quickly apparent that Flanagan made all the

decisions, and Wynalek lacked real authority. The company consisted of nine people at the time:



45.     When she began at the company, Silverman was the only scientist. Soon after she began, in 2012, Anthony Mangum was hired as an analyst in finance and operations.[1] In or around 2012, DiscGenics hired Galina Dulatova, who had been working as a scientist for Duntsch in Memphis; Terry Tandeski, a scientist; and John Ward, an engineer, who all reported to Silverman. Silverman was the highest-ranking woman at the company; there were no women in leadership, and the other managerial employee was a man (Mangum).

46.     At the time, DiscGenics was sharing an office space with the University of Utah's Cell Therapy and Regenerative Medicine ("CTRM") Facility. Flanagan and Wynalek each had a private office and there were two bays of cubicles, one for Silverman and Mangum and one for the scientists and engineer(s). A CTRM receptionist had a desk right outside of Flanagan's

---

[1] In 2013, Mangum was promoted to Senior Analyst in Finance and Operations. In 2016, he was promoted to Manager; in 2019 he was promoted to Director and in August 2021, he was promoted to Senior Director of Operations, which is the title he holds at the company today.

office, and there was a communal conference room right next to her. Around the other corner

was DiscGenics' lab space, which was partially shared with CTRM employees, who sat across

the hall on the same floor.

47.    As Project Manager and Engineer, Silverman oversaw a team of two to three other

scientists (Dulatova and Ward) to run studies that improved the manufacturing of IDCT and

explored how to improve the product's efficacy. Silverman also oversaw an external lab that

performed studies on rabbits to test the safety and efficacy of IDCT. During this time, Silverman

worked closely with an external manufacturing team to set up production in a "Clean Room"

with the goal of creating a product that could be safely tested on human beings.[2] She also

supported and generated all the new intellectual property, and created slide decks and

promotional materials for fundraising activities, in which she directly participated.

48.    Silverman quickly noticed that Flanagan and Wynalek regularly and openly discussed

women they considered sexually attractive, and made other sexually-charged comments not only

with each other but with their subordinates. She was horrified to hear Flanagan often discussing

his sexual relationship with his wife, including how often she engaged in oral sex with him, and

bragging about her "skills" to whomever was around.

49.    Throughout her employment, Silverman noted that Flanagan made a point to only refer to

women in general as "girls." He regularly referred to the "girl" who spoke on the call yesterday,

or the "girl" who visited the office, including vendors and suppliers. In contrast, he referred to

men as "people" or "men", but never "boys." He even called women "girls" when referring to

meetings with potential strategic partners and during fundraising. Silverman was afraid to correct

---

[2]A clean room is a space that is isolated, well-controlled from contamination, and actively cleansed. It is designed to keep everything from dust to airborne organisms away from it and the product that is being handled inside.

Flanagan so early on in her career, as her success at DiscGenics heavily depended on Flanagan's approval of her.

50.     In one meeting, a female scientist at the company of a potential investor was asking astute questions to Silverman about DiscGenics' product during a pitch. The next day, Flanagan was complaining about her and was especially annoyed, as he tended to be around smart female scientists. He repeatedly referred to this PhD scientist as "that girl" until Silverman finally summoned the courage to say, "Flagg, how about we say person or scientist?" After this, Flanagan's frequency of calling women "girls" decreased, although Flanagan became noticeably more distant toward Silverman as a result. Because many of the company's strategic planning and decisions were executed informally, the standoffishness meant that Silverman was excluded from decisions she had previously been involved in and had to expend more time and energy trying to voice her opinions to Flanagan on matters in her purview. This direct retaliation was the very reason she had been hesitant to say anything in the first place.

51.     Soon after Silverman started her job, Wynalek began joking that she had a crush on a particular sales representative. He repeatedly teased her for meeting with him, claiming she was orchestrating the meetings because of her "crush," rather than her efforts to secure more business for the company. Wynalek persisted with this "joke" for an entire year before Silverman finally summoned the courage to ask him to stop. He acted shocked and taken aback; in the weeks that followed, he became noticeably distant and standoffish towards Silverman, as Flanagan had. It was clear that rather than feeling contrite for inappropriately sexualizing Silverman, he was frustrated that she had the audacity to stand up for herself, something he was not used to women doing.

52.     In early 2013, Silverman approached Flanagan to ask for a higher title which would more accurately reflect the breadth of her responsibilities. In addition to the two scientists and engineers she directly supervised, she also oversaw the contract research lab engaged in animal studies, and the contract manufacturing lab that was setting up the manufacturing process. Silverman also led the intellectual property program with an IP firm. She was overseeing the entire scientific program at the company, and there was no scientist or staff member who had more expertise than she did. Flanagan denied her request, telling her she "did not have enough experience" for a higher title. This was confusing to Silverman because Duntsch had held the CSO title without having any prior business experience or real-world scientific experience beyond his PhD. Indeed, like Duntsch, Silverman had also just completed her PhD, but had only been given a Project Manager title.

53.     In the summer of 2013, Silverman learned she was pregnant with her first child, and disclosed her pregnancy to the company. A few months later, now visibly pregnant, Silverman was at a regular company-wide meeting in a conference room with approximately six of her colleagues, including Wynalek, Isaac Erickson, an engineer with whom Silverman had attended UPenn, Mangum, and her reports Dulatova and Ward.[3] Out of nowhere, Flanagan conspicuously pointed to Silverman's pregnant belly, grimaced, and asked the entire room, "how is she going to do her job now?" Silverman was speechless and mortified, as were many others in the room.[4] Silverman sat through the rest of the meeting looking down at her lap and feeling her cheeks burning; as soon as it was over, she ran out of the conference room as quickly as possible.

---

[3] Erickson was promoted to Senior Program Manager in 2015, to Director of Bioprocess Engineering in 2019, and in 2021, to Senior Director of Bioprocess Engineering, which is the title he holds today.

[4] In the following years, multiple staff members recounted this incident and asked Silverman, "how did you recover from this?"

54.     Flanagan continued to make snide remarks about Silverman's pregnancy and glared conspicuously at Silverman's body. Worrying that her job was in jeopardy, Silverman agreed to only take two weeks of maternity leave.

55.     On January 14, 2014, Silverman was admitted to the hospital for an emergency c-section at 37 weeks. After a difficult and dangerous delivery, Silverman's baby was in the NICU for two days after there were complications with the umbilical cord, and Silverman recovered in the hospital for one week. Nonetheless, within two weeks, Flanagan and Wynalek instructed Silverman to resume working, at least part-time, to attend meetings.

56.     Silverman desperately did not want to return to work merely two weeks after her first child was born, especially after such a grueling experience from which she was still recovering, but Flanagan and Wynalek told her that they "had no one else" and that they "needed [her] on calls." Thus, for the next two months, Silverman worked part-time from home as she recovered from her surgery and attempted to bond with her newborn.

57.     In March 2014, Silverman returned to the office. The company failed to provide a private space for Silverman to express breast milk. As a result, Silverman pumped in a small storage closet multiples times a day. There was a private bathroom with a shower that she asked to use, but she was told that both CTRM and DiscGenics employees were actively using it. Eventually a CTRM employee stepped in and said she should just use the shower room, and bring in a folding chair so as not to have to sit on the toilet.

58.     After four months of watching Silverman pump in the closet and then the bathroom, the CTRM staff took pity on Silverman and offered to convert an old storage closet into an office where she could pump privately. This "office" became her fulltime private office after that.

59.     Upon her return, Silverman noticed that Flanagan's sexual commentary had become even more commonplace. Flanagan's office was directly adjacent to the CTRM staff, who complained of his vulgar and sexually explicit language constantly.[5] In a company-wide meeting that year, Flanagan made a crude sexual joke that referenced his penis explicitly. Dulatova became visibly distressed by the vulgar joke. Her eyes went wide, her face turned red, and she quickly got up and left the conference room. After this incident, Dulatova avoided company-wide meetings and kept to herself in the lab and at her desk. At the time, there was no HR team or representative, and no one with whom to raise concerns, especially given that the behavior was being fostered by the two highest-level executives and directors at the company.

60.     In or around 2014-2015, DiscGenics hired a few more individuals such that the company's reporting structure was as follows:



2014-2017

---

[5] CTRM was so horrified by Flanagan's behavior that it required all DiscGenics staff to complete an online training on Professionalism and Sexual Harassment.

61.     Silverman was now the only woman out of eight individuals in managerial positions at the company and she was the only head of a department supervising four people.

62.     In early 2015, Silverman became pregnant again, and duly informed the company. Within a few months of her disclosure, in July 2015, Flanagan approached Silverman in her office and informed her that he was setting up a "transition plan" for Silverman to exit the company. He explained that because she "now had two children," he therefore "assumed [she] would no longer be able to do her job." Silverman was shocked, but managed to calmly state that she had no intention of leaving the company. She told Flanagan she felt confident she could perform her job while still having children at home. Flanagan appeared confused by this response and said that they could "continue to discuss," but neither broached the subject again.

63.     Silverman was certain that Flanagan had never approached her male colleagues who also had children in the same manner.

64.     Silverman again became very worried about her job security, as she knew Flanagan would be watching her closely for any perceived slippage of performance. She felt ashamed to be a mother, because Flanagan and Wynalek clearly felt her parental duties would likely interfere with her job. She decided to call JB Henricksen, a new part-time contract CFO who had also assumed some HR duties. She explained that Flanagan had made it clear he thought her status as a mother would impede her ability to do her job.

65.     Henricksen replied that he did not have the authority to enact any changes, and that she should just "find a way to make it work."[6]

---

[6] Henricksen only served as a contract CFO for two years and Flanagan terminated his contract in 2017.

66.    Silverman was so upset by Flanagan's treatment of her as a new mother that she consulted with an employment lawyer that summer. However, she was too afraid of retaliation to pursue legal action at that time.

67.    From 2015 to 2017, both Flanagan and Wynalek often mocked the female director of the CTRM facility, in front of everyone. They had baselessly determined she was gay, and regularly deployed sexist and homophobic stereotypes to mock her.

68.    Specifically, they targeted her woodworking hobby, and accused her of "fabricating dildos" in her spare time. They also regularly made fun of her weight, something they never did to men. In many meetings where Silverman, Flanagan, and Wynalek discussed activities or next steps with CTRM, Flanagan and Wynalek brought up the subject of this "hobby," snickering and simulating woodworking with their hands. Whenever any staff member mentioned her in passing, Flanagan and Wynalek commented that she "needs to relax and just use her dildo." Eventually, Silverman got so fed up with this commentary that she asked Flanagan and Wynalek to stop. As before, Wynalek grimaced, and acted noticeably cold towards Silverman in the weeks that followed.

69.    In 2016, Flanagan, Wynalek and Silverman attended a fundraising trip. (This was not unusual; though her title did not reflect it, Silverman effectively was part of senior leadership for fundraising purposes.) At a dinner, Flanagan told a story about a female patient who underwent neck surgery and was later found in the recovery room performing oral sex on her husband. Wynalek laughed at the story in delight and commented that she was a "loyal wife" who was "doing her job." Silverman was mortified, but since she was alone with Flanagan and Wynalek and wanted to maintain good standing with the executives, she simply attempted to shift the

conversation to another topic. However, the incident was extremely upsetting and demoralizing for her.

70.     Also in 2016, DiscGenics acquired additional office space on the first floor of the building with CTRM. The male bathroom included a shower. Flanagan and Wynalek, along with younger male staff, regularly joked that the shower's purpose was for "romantic encounters." Indeed, thereafter, every time a man was late to a meeting, someone invariably asked, with a smirk or wink, if he had stopped in the men's shower for a "quick break." Flanagan and Wynalek would snicker, and the staff would be forced to play along.[7]

71.     Flanagan often made comments mocking women's appearances and deriding them as unattractive, commenting "yeesh" as he made a disgusted face. One time, he made this comment about a potential investor after a meeting with her.

72.     All of these inappropriate and sexist remarks by Flanagan, Wynalek, and other male employees who had been conditioned to believe this was normal work behavior, left Silverman feeling exhausted and demoralized, not to mention objectified and disregarded professionally. However, she believed she was adding great value to DiscGenics, and that the opportunity to contribute to a new medical invention outweighed the hostile work environment. She therefore continued to put her head down and focus on the science, hoping that if she continued to object to inappropriate conduct, the male executives would eventually alter their practices.

***Flanagan's Behavior and Comments Become Increasingly Inappropriate and Egregious in Recent Years***

73.     In early 2019, DiscGenics moved to a new facility. The new facility was an entirely open office with only two private offices for Flanagan and Wynalek (later, one was added for Plaintiff

---

[7] In 2017, Silverman pulled Mangum and Erickson aside and requested they stop laughing at this joke because it made her, and likely other staff, uncomfortable. They agreed and apologized to Silverman.

Poole when he joined). No other staff were given private offices, including Silverman, despite the fact that she now had several more direct reports. Whenever she asked Flanagan if she could have her own office, he refused, and then ridiculed her behind her back for being "too self-centered."

74.     The new facility was a rented space shared with Biomerics and another company. The rationale for moving to this space was to build a manufacturing facility, which was to occupy the majority of the space, while the research lab was small and inadequate.

75.     In the new facility, Flanagan set up cameras that operated 24/7 in the lab space and reminded staff often that he was "watching" them. For example, one Sunday, he sent a text message to a female employee asking why she was in the lab, indicating that he had been surreptitiously watching her for an unknown period of time.

76.     Later that year, Flanagan entered the main conference room at the office for a staff meeting and announced that he was "much more relaxed today" because his wife had returned from a trip and "taken care of him" the night before. Wynalek laughed; Mangum, Erickson and Justin Bingham, the Director of Manufacturing, gave a nervous chuckle.[8] Silverman commented, "Flagg, come on now!" in an attempt to diffuse the situation, but it did little to remediate the visible discomfort of everyone else in the room.

77.     Also in 2019, during a meeting Silverman was in with Flanagan, Wynalek and Mangum, the three men joked that the company should change its name to "Dickgenics" with the objective of making "larger dicks"; the men agreed this was a "much better goal." Silverman was speechless and felt that the scientific progress she had made at the company was being

---

[8] Bingham was hired in 2017 and promoted to Senior Director of Manufacturing in January 2019. He was laid off from the company in January 2021. Bingham never had more than two direct reports.

completely belittled.[9] Silverman felt uncomfortable protesting because the three men were

obviously taking great pleasure in this "joke," from which she was clearly excluded.

78.     DiscGenics' hyper-sexualized work environment extended to outside stakeholders. As a

scientist whose job it was to explain and pitch the IDCT product to investors, Silverman often

travelled to Japan with Flanagan to meet with investors. In 2019, on one such trip, Silverman

was out at a dinner with Flanagan and Colin Novick, who at the time was a paid consultant (he is

now a DiscGenics Director). Flanagan and Novick had apparently been gossiping because

Novick nonchalantly remarked to Silverman, "honestly, I don't understand why you aren't

hooking up with Isaac [Erickson]." The comment was seemingly out of nowhere, and certainly

Silverman had not said or done anything to encourage this conjecture; Erickson and Silverman

had both been happily married with children for many years. Clearly, Novick had correctly

ascertained that the DiscGenics culture, as set by the male leadership, not only accepted but

condoned such inappropriate banter. Silverman was mortified by this comment, while Flanagan

laughed in encouragement.

79.     In addition to his constant sexual and misogynist remarks, Flanagan was known to have a

horrible temper. For example, in meetings, Flanagan yelled, stood up and leaned over the

conference room table to berate individuals, banging his hands on the conference room table.

During one of these tirades, he told a group of employees "if anyone ever double-crosses me,

they are fucked."

80.     Flanagan's temper and constant use of threats made it impossible for employees to raise

formal complaints due to fear of retaliation. Since there was no formal HR department or point

---

[9] In Peacock's Dr. Death series, the executives are depicted at a dinner scene where they comment about "using the product to make their wanker bigger." Clearly, Flanagan and Wynalek had made this comment to others, who had passed it along to the producers of the series.

person until 2019 (excluding the brief period that Henricksen had been a part-time CFO), there was no one to complain to about Flanagan's behavior (other than Flanagan himself). The board was comprised of Flanagan's friends, who could not be trusted to meaningfully engage about Flanagan's behavior in a way that would help the employees.

81.     In 2020, Flanagan began sleeping in a pull-out bed in his office on occasion when his wife was out of town (he later moved to Wyoming to avoid paying Utah State Income tax, which meant his commute was an hour and half long and he started sleeping at the office more often). Female employees found this awkward and anxiety-provoking, especially when they were working late; employees had to walk by Flanagan's office to exit the building, and it was unclear what he was doing in his office during these late hours.  Flanagan did not have his own restroom, and employees were also aware that he took showers at the office, in a shared restroom. Flanagan added to the discomfort by making jokes about "using a bedpan so that [he] doesn't offend people by walking into the office corridors in [his] boxers." He had basically turned his office into his second home and sometimes looked quite disheveled in the mornings.

***DiscGenics Repeatedly Overlooks Silverman's Accomplishments and Expertise Because She is a Woman***

82.     Since Duntsch was removed from his position in 2011, the Chief Science Officer position had remained vacant. Silverman was significantly more experienced and capable than any other scientist at the company — certainly more than Duntsch at the time he held the title.

83.     In 2013, Silverman requested to be promoted to CSO. The only other two C-suite executives at the time were Flanagan as CEO and Wynalek as COO, neither of whom had any scientific background or higher education degrees after their bachelor's degrees.

84.     Flanagan refused and told her she did not have enough experience.

23

85.     Finally, in 2016, Flanagan promoted Silverman to the position of Director of Research and Development. At this time there were three other employees who were the heads of their departments: Randy Domingo, Director of Quality, Mangum, Manager of Operations and Erickson, Senior Program Manager of Engineering. All three of them and Silverman reported to Wynalek.

86.     Silverman was grateful for the promotion, but she was performing significantly more work and had much wider ranging responsibilities than the other department heads.

87.     While Silverman supervised approximately 10-15 employees, Domingo did not supervise anyone, Mangum only ever had two direct reports, and Erickson had three or four. In addition, not only did Silverman manage the scientists, but she also worked on intellectual property with outside firms, participated in a vast majority of fundraising meetings, drafted press releases, managed company events and morale-building activities, wrote and submitted scientific papers and attended scientific meetings.

88.     Over the next five years, during performance reviews, Silverman repeatedly asked to be promoted to CSO, as clearly the "director" title inadequately reflected the breadth of her responsibilities. Though she was consistently denied the title without explanation, she received only excellent reviews, and constantly met her timelines and requirements. As she took on more and more responsibilities, it was increasingly clear that she was effectively performing the CSO role and that she deserved the title.

89.     Throughout the entirety of her tenure, Silverman was the only non-C-suite executive to join Wynalek and Flanagan at all fundraising events and conferences and many board calls. She set up and led internal meetings, drove strategy development, and made business decisions in

ways that were commensurate with the CSO title.[10] None of the other heads of departments ever attended fundraising events or board meetings.

90.    Nonetheless, throughout Silverman's tenure, Flanagan and Wynalek maintained that Silverman did not "deserve" the CSO title and that they were "not sure" the company would ever "need" a CSO (even though Duntsch had held the title previously).

91.    Thus, not only did the executive team and board of directors consist of all men, but until 2019, every other department head besides Silverman was a man.

***Another Woman is Finally Hired as a Department Head***

92.    In May 2019, DiscGenics finally hired a second woman at the managerial level: Teresa Clark, who replaced Randy Domingo as Director of Quality. The Director of Quality is responsible for implementing Quality Management System to enable GMP (Good Manufacturing Practice, a system for ensuring that products are controlled according to quality standards), overseeing manufacturing practices, and ensuring compliance with FDA regulations. As such, in 2019, the organizational structure of DiscGenics looked like this:

---

[10] Indeed, by the time she left in 2021, Silverman oversaw half of the approximately 32 employees at the company, still without the CSO title.



93.     Clark brought extremely relevant experience and expertise to the job, which by all accounts she performed successfully. Even so, Wynalek and Flanagan constantly questioned her suggestions at work, refused to give her much-needed staff, and hired additional consultants to double-check her work, something they never did to her male peers, especially at the high level she was supposed to be.[11]

94.     In the spring of 2019, after again requesting the CSO title, Silverman was promoted to Senior Director of Research and Development. While Silverman was happy about the pay increase, her title still failed to reflect the scope of her duties and the breadth of accomplishments she had achieved throughout her tenure.[12] Again, at this time, there still were no women either in the C-suite or on the board of directors.

---

[11] Indeed, when Poole joined the company, on a few occasions he made recommendations to Wynalek and Flanagan regarding the Quality department, despite no prior direct experience. He was more or less repeating Clark's ideas, but Wynalek and Flanagan immediately approved his requests, whereas they had questioned and/or rejected the same ideas when Clark made them.

[12] In addition, when an objective salary review was conducted in 2020, Silverman's salary was found to be only 60% of the market average for a comparable role in other BioPharma startup companies. It would have been drastically lower had she received the CSO title she deserved.

95.     A few months later, Silverman had a private meeting with Wynalek. She told him that Flanagan's behavior was increasingly erratic and hostile, and that she felt she was being treated worse because she was a woman. Silverman again brought up the fact that she should have the CSO title and commensurate compensation, and that she was performing the responsibilities of a CSO already. Wynalek encouraged Silverman to "be patient" and assured her she would be CSO "one day," contradicting his former statement that he was "not sure" the company would ever "need" a CSO. However, he did not offer a timeline or any measurable steps Silverman could take to achieve the CSO role sooner.

96.     During this meeting, Wynalek remarked that he also felt pressured and uncomfortable by Flanagan's inappropriate comments at work, but he felt like he "had to make it work." While Silverman had trouble believing that Wynalek felt "uncomfortable," it was true that Flanagan's behavior was becoming increasingly unhinged and Wynalek appeared more and more "reasonable" in comparison.

97.     Flanagan's worst and most inappropriate behavior was reserved for the scientific staff, which incidentally was the most heavily female department in the company. Silverman had to work to shield her team from Flanagan's and Wynalek's sexist comments and conduct. For example, when Flanagan and/or Wynalek attended meetings with Silverman's team, she purposefully ended the meetings quickly, and cleared the room immediately, to shield her reports from the sexual, off-the-cuff remarks the men often made at the beginning or end of such meetings. Though it was less efficient and took more of her own time, she arranged to conduct meetings with Flanagan and Wynalek alone, and then relayed messages to her direct reports, to protect them from the inappropriate behavior.

***Poole Joins DiscGenics and is Shocked by the Sexist Boys' Club Work Culture***

98.     Poole grew up in a small town in South Carolina. He went to Clemson University, where he graduated at the top of his class and received his Bachelor of Science in Microbiology in 2000. After college, Poole moved to Japan to teach English at a Junior High School. When he returned from Japan, he went on to receive his Master's in International Business from the University of South Carolina in 2007.

99.     Poole has extensive experience in the biotech sphere. From 2007 until he joined DiscGenics, he had worked for Medtronic in a variety of capacities: he served as a Principal Business Analyst, ASIA Finance Manager, Finance and Operations Director for Australia/ New Zealand, Senior Finance Director for Asia Pacific, Senior Finance Director for Spine, and Finance Vice President for Spine and Biologics. In all his finance roles, he was considered a strategic partner, and worked closely with the legal and HR departments on a variety of employee-related topics.

100.    From December 2018 until his departure from Medtronic, Poole served as the Finance Vice President, and was the CFO for a Global Business Unit with multi-billions of dollars in annual sales. Poole had many responsibilities he had performed successfully, including providing strategic direction and financial governance, collaborating with the marketing and sales departments to improve strategic decision making, and supporting growth acceleration through financial rationalization.

101.    In the summer of 2020, Flanagan recruited Poole to join DiscGenics. He persuaded Poole to join DiscGenics by telling him that if he did, he would be the CEO of the company in a few years.[13] He also told Poole that a huge global conglomerate would potentially acquire the

---

[13] Flanagan even went so far as to tell third party investment firms that Poole was a strategic hire who could lead the company if the timelines were extended and he retired. Foley also made comments to this effect.

company for $1B or more within the next 18-24 months, persuading Poole to take a salary reduction of greater than 70% of his annual employment income in exchange for employee Incentive Stock Options (ISOs). Flanagan projected that the shares would be worth at least $3M on an exit within the proposed exit timeline, and repeatedly boasted about the strength of clinical data (from an unblinded study),[14] market size/indications, and commercial readiness. Flanagan's financial sales pitch was so convincing that Poole agreed not only to accept employment at a significantly reduced base salary, but also to invest as a shareholder in the company's Series C investment round, which had not yet closed.

102.   Poole observed warning signs of sexist conduct by Flanagan and Wynalek from the outset. Even throughout the hiring process, which included an interview and multiple phone calls, Flanagan referred to board member Dr. Najeeb Thomas's wife as a "trophy wife," which Poole found strange in light of the fact that she had a medical degree and was a practicing cosmetic surgeon.

103.   After Poole had accepted the position, but before he began working at the company, in a meeting with Flanagan and Wynalek, Flanagan complained to Poole about Silverman's work performance. He told Poole that he wanted "help getting rid of her" because "she thinks she's the smartest person in the room." Of course, Silverman had never received any actual substantive criticisms about her performance, and Flanagan did not articulate any complaints other than his general view that she should be more humble and deferential.

104.   It was evident to Poole that Flanagan wrongly assumed that because Poole was a man – with a southern accent, just like him – he would be an enthusiastic participant in the pervasive sexual banter and inappropriate conduct.

---

[14] *See* ¶ 221.

105.    It was also immediately clear to Poole, even at this early juncture, that Flanagan's irrational dislike of Silverman, and apparent desire for her to show more humility and deference to her colleagues, was because she was a woman. Silverman's reputation had preceded her in the industry, as she was highly regarded by external parties due to her educational background and clinical contributions to the advancement of DiscGenics' core technology. Poole sensed that Flanagan was threatened by Silverman's professional position and the high esteem she garnered from colleagues. None of Flanagan's complaints about Silverman had any basis in reality, and he never complained about the male employees in such a bitterly hostile and personal manner.

106.    Flanagan was so bizarrely fixated on his irrational dislike of Silverman that he apparently went so far as to make derogatory and discriminatory remarks about her to other job candidates. Silverman participated in the interview process to find a new Director of Quality after Clark left the company; on multiple occasions, Silverman noticed that potential candidates often acted noticeably and pleasantly surprised at her collaborative approach and demeanor.

107.    On August 16, 2020, Poole began working as DiscGenics' Chief Financial Officer, a position that had remained vacant since Henricksen's brief two-year contractual stint at the company from 2015-2017. Part of Poole's compensation was a small share of equity in the company.

108.    By the time Poole began working at DiscGenics, it employed approximately 35 employees. Poole reported to Flanagan directly and had daily 8 a.m. standing meetings with Flanagan and Wynalek. The organizational structure of the company at that time is reflected in the following chart:[15]

---

[15] Faded boxes are used to demonstrate that employees resigned or otherwise left during that time frame; dotted lines are used to show the reporting structures that Poole put in place shortly after he arrived to protect the female heads of departments from Wynalek's and Flanagan's conduct.



109.    Poole quickly realized that the sexist comments and behaviors he had observed during his interviews were the norm at the company, rather than the exception. In private discussions with Poole and Wynalek, Flanagan referred to at least five female employees as having "resting bitch face." He showed a particular disdain for women with PhDs, referring to them as "brats" and "merely academics," who "lack[ed] business skills."

110.    Indeed, during Poole's first few weeks, Silverman shared with him some examples of the sexual harassment and gender discrimination she endured at the company over the years. She explained how Flanagan and Wynalek engaged in "sexual humor" that made her and others extremely uncomfortable and provided the examples detailed herein. She also told Poole that when she attended fundraising meetings with Flanagan and Wynalek, they instructed her to leave the room after her pitch so that they could talk about finances. When she protested and argued that she felt her experience and insight were critical, they dismissed her. Silverman felt

disrespected and wondered whether she would have been included if she were a man, especially since, to her knowledge, Duntsch had always been included in such meetings.

111.     Silverman also told Poole that Flanagan had made jokes about oral sex at work and about sex with his wife during company meetings. She informed Poole that she had escalated her concerns to a previous part-time CFO (Henricksen), but that his contract had been abruptly terminated shortly thereafter, so she had been fearful to report her complaints again.

112.     Over the ensuing weeks, Poole witnessed many examples which corroborated Silverman's concerns. He saw that Flanagan's immediate reaction to any suggestion or idea brought forward by a female manager was that it was "bad" or "worthless." Of particular concern was how quickly Flanagan dismissed and scrutinized the technical experience and recommendations made by Silverman, as well as Clark, the Director of Quality, and Lara Dennie, who had been hired in April 2020 as the Director of Clinical/Regulatory Affairs. Flanagan was much quicker to approve any requests made by Erickson or Mangum.

***Poole Attempts to Change the Culture and Protect the Female Staff from Sexist Behavior***

113.     Between August and September 2020, Flanagan and Wynalek repeatedly denied requests made by Clark for additional staffing she desperately needed in the Quality department. Once Poole joined, he reassigned Clark to report to him; he immediately saw that the requests were justified and long overdue, and approved them. Similarly, Flanagan and Wynalek refused to accept any expertise provided by Dennie with respect to Clinical Timelines, completely undermining her experience.[16]

114.     When Poole started, the company was in the midst of a "Phase II Clinical trial" in human beings. The results were blinded, meaning that neither the patients nor the executive leadership at

---

[16] This happened regularly between Dennie's start date (April 2020) and September 2020, when Poole stepped in and advocated for her position.

DiscGenics knew which patients were receiving a clinical dosage versus a placebo.   The trial had 60 patients in the U.S. and about 36 in Japan. Flanagan regularly bragged to anyone who would listen about how positive the results of the trial were, even though they were blinded results and he could only read aggregated data, meaning no conclusions could be drawn from the data.

115.    When Dennie, who was the Director of Clinical/Regulatory Affairs and therefore the most familiar with the trials, heard these remarks, she delicately attempted to prevent Flanagan from making inaccurate statements. She quoted industry precedents and opined that no matter how good the results were, DiscGenics would still need additional clinical trials before getting clinical approval from the FDA, and that it was therefore premature to celebrate the results. Flanagan took particular personal offense to Dennie's comments; he complained to Poole constantly about Dennie expressing her opinions, even going so far as to say that he would fire her for even suggesting that they would not get an immediate approval. Poole was concerned that this was not only a purposeful dismissal of technical expertise provided by a female colleague, but also that Flanagan's reckless disregard had already resulted in misrepresentations to investors during Series C funding of the financial returns and commercialization timing of DiscGenics' product.[17]

116.    Poole was also tasked with leading HR at the company. Poole had worked closely with HR in his former role at Medtronic, so he was happy to take on the additional responsibilities,

---

[17] Later, Foley recognized that the company's failure and refusal to acknowledge Dennie's expertise had resulted in misappropriation of funds towards manufacturing, at the expense of critical needs requested by Silverman and Clark. When Poole complained to Foley that the misrepresentation of timelines and financial returns may have been misleading to shareholders, Foley agreed that the returns and timelines were never realistic, but dismissed any obligation to be more transparent with shareholders, often stating that Flanagan was simply "the ultimate salesman."

especially since there had been no HR department or personnel whatsoever since 2017, and it appeared to be a large gap he could fill at the company.

117.    Throughout September 2020, Flanagan continued to speak negatively about Silverman in ways that Poole found alarming. For example, Flanagan lamented that he should have fired Silverman for working from home during the Covid-19 pandemic, even though the company's own policy required her to work from home, and many others did. During another private discussion between Poole and Flanagan later that month, Flanagan remarked that Silverman had gone "bat shit crazy" from her hormones when she was pregnant.

118.    On September 11, 2020, in a Zoom weekly update call between Flanagan and Poole, Flanagan randomly embarked upon a tirade, for a full fifteen minutes, about his disdain for Silverman. He remarked that he would "sell the company for half of what it's worth within a year, so that [he] never has to see [Silverman's] face again."

119.    Poole was shocked at the unbridled disdain Flanagan seemed to have for Silverman, especially as Flanagan had yet to articulate any substantive criticism of Silverman or her work. Poole also noticed that when Silverman disagreed with one of her male colleagues, such as Erickson, Flanagan immediately disregarded Silverman's opinion by dismissing her on the basis that she "must have been romantically involved with him at some point." (Flanagan did not explain why Erickson's opinion was not subject to the same dismissal under his theory.)

120.    Poole noticed other male employees following suit. For example, when renovations to the office space had been conducted in early 2020, Silverman had successfully lobbied for a private room to be designated for women who were pumping breast milk at work. That fall, Wynalek and Flanagan joked to Poole that because all the conference rooms were named after mountains, the pumping room should be called the "Grand Tetons."

121.    All of these incidents, which occurred in a relatively short period of time, prompted Poole at the end of September 2020 to insist that Silverman and Clark report directly to him rather than to Wynalek, and that Dennie report to Foley. These lines of reporting were untraditional in terms of business, but were effectuated solely because all three women had expressed so many concerns with Flanagan's behavior and Wynalek lacked interest in remedying the situation.

122.    Of course, this measure, while helpful, did not prevent Flanagan from continuing to harass Silverman and other women at the company. In late 2020, Flanagan installed a safe in his office to house the lab notebooks, which Silverman used regularly. Indeed, Flanagan told Poole privately, with a menacing grin, "I can't wait to see the look on Silverman's face when she realizes she has to walk past me every morning to retrieve [them]." For a few months, Silverman and the rest of the scientific staff had to engage in unnecessary, daily interactions with Flanagan, simply to retrieve the notebooks. Eventually, Poole managed to move the safe to a conference room, as it was blocking Flanagan's pull-out couch/bed in his office.

123.    During his daily meetings with Wynalek and Flanagan, Poole was flabbergasted by the lack of professionalism both men displayed. He repeatedly reminded them that he was responsible for HR duties, some of the language they used was inappropriate, and they needed to stop. Poole even attempted to discuss his concerns privately with Wynalek, but Wynalek simply insisted that as a man in his 60s, Flanagan was too old to be expected to change his behavior, and instead they would just have to try to protect the employees from it.

124.    In early 2021, during one such daily meeting, Flanagan joked about wanting to be cremated and asking someone to throw his ashes into his wife's face so he "could get one last blow job" from her. Poole was horrified and disgusted, while Wynalek laughed along.

125.    In February 2021, after an unsuccessful sales pitch meeting with representatives from a large medical device company, Flanagan told Wynalek and Poole that one of the female representatives "must have daddy issues."

126.    In April 2021, after a video call with a potential investor in Hong Kong, Flanagan told Poole that he "had an Asian fetish" and that he thought one of the women on the call was "the most beautiful woman he had ever seen." Flanagan attempted to rope Poole into the discussion – as it was now just the two of them on the call – saying, "she has a perfect face, don't you think?" Poole felt extremely uncomfortable and refused to engage.

127.    Despite Poole's best efforts, Flanagan continued to make sexual jokes. Sometimes he said, "wait, I can't say this now with HR in the room," pointing to Poole, but he invariably then proceeded with the joke or comment anyway. During a discussion in early 2021 with Poole and Wynalek about renovating the second-floor office space, Flanagan remarked that he would ask the contractors to leave the crane behind for himself and his wife, for their "sexual exploits."

128.    Throughout Poole's tenure, Flanagan continued to complain about female employees in a hostile and aggressive tone he never used when discussing the male employees. In these private discussions, Flanagan often turned red with anger and raised his voice, causing Poole to be concerned for the physical safety of his female colleagues. Poole was not alone in this fear; Dennie later told Poole privately that she was afraid to be in the same room as Flanagan because she anticipated that his rage could quickly turn into physical violence. Poole suggested that Dennie work from home when she could; he also volunteered to accompany her to any meetings where she would be otherwise alone with Flanagan.

***Silverman and Poole Decide to Alert the Board of the Sexist Boys' Club Environment
Flanagan Had Fostered at the Company***

129.    On October 17, 2020, Poole, in reaction to the concerning feedback he heard from

Silverman, Dennie and others about Flanagan's behavior, decided to approach Foley, the Chief

Medical Officer who sat on the board of directors, to ask for a private meeting at his home.[18]

Foley rarely came to the DiscGenics office, so Poole figured Foley may be unaware and might

be receptive since he had a lot of money invested in the company.

130.    During the meeting, Foley asked why Silverman was reporting to Poole. He correctly

noted that it didn't appear to make sense for R&D to report to the CFO. Poole told Foley about

Flanagan's mistreatment of Silverman, and explained that Silverman was reporting to him so he

could protect her from Flanagan. Poole told Foley that he understood Silverman's work as

critical to the company's success, and he was concerned she might resign due to Flanagan's

constant sexist criticism and mistreatment and the sexually hostile work environment he fostered.

Foley acknowledged that he had heard some of Flanagan's comments about Silverman, and that

he was inclined to believe what Poole was telling him. Though he did not provide a solution, he

asked Poole to contact him regularly with concerns about the situation and told him to "take

care" of Silverman. He agreed that Silverman was performing very well and expressed his hope

that she remain at DiscGenics.

131.    Thereafter, Poole and Foley spoke on at least a monthly basis; Poole remained hesitant to

share all of the details of Flanagan's sexist and unprofessional behavior as Foley was personal

friends with Flanagan and Poole was unsure whether Foley actually cared about the sexist work

---

[18] On October 8, 2020, Dennie had also texted Poole to relay her shock over what Flanagan and Wynalek got away
with regarding the discrimination Silverman faced. Dennie told Poole she was scared because she had just learned
another employee was pregnant and may face similar harassing treatment.

environment or just that this potential liability could affect the company's value (and thus, his investment).

132.     It remains unclear what, if anything, Foley did with the information he was receiving; certainly, Flanagan's and Wynalek's behavior did not change. Poole hoped that Foley would put the company's interest (and employees) first, but that did not appear to be the case. Although Foley had asked Poole to share his concerns, whenever Poole actually did so, Foley cut him off abruptly and said, "deep down, I think Flagg [Flanagan]'s a good person." It was apparent that Foley would not be an ally in Poole's efforts to eradicate the pervasive sexism within the company, and that Poole remained severely outnumbered; he therefore worked to manage the situation discreetly as best as he could, to avoid retaliation.

133.     In December 2020, in an effort to ameliorate the work environment and educate Flanagan about his unlawful conduct in the workplace, Poole instituted a requirement that all managers and executive-level employees complete online sexual harassment training by the end of January 2021.

134.     Poole sent Flanagan multiple reminder emails to complete the training, including an email stating that the training was required as part of the company's liability insurance policy. Nonetheless, Flanagan failed to comply by the deadline (and still had not completed the training as of May 2021, the last time Poole was able to check).

***Female Employees, Left Without Recourse, Exit in Droves***

135.     From mid-2020 through early 2021, six women including Clark and Dennie resigned from DiscGenics. Some of their departures are captured in the following organizational chart, along with the other women who departed or otherwise were let go from the company in 2021 (hexagons are used to show individuals who were separated from the company involuntarily).



136.     Katie Morris was one of the six women who resigned from DiscGenics; she had

accepted another offer at a diagnostics company that focuses on degenerative diseases. After

Flanagan found out where she was going, he became enraged, believing that the diagnostic

company was a competitor of DiscGenics. Clark, who was Morris's supervisor, and other

DiscGenics employees disagreed that DiscGenics was a competitor; the new company worked in

diagnostics, whereas DiscGenics researched treatment. In her exit interview, Flanagan raised his

voice and said he had a problem with where she was going and would "look into it" further.

After the meeting, Morris approached Flanagan to say she didn't appreciate his tone during her

exit interview and that he could have handled himself more professionally and privately. In

response, Flanagan yelled at her so loudly that the entire office heard and said that he "would see

to it that [she] never worked in this industry again." Morris left the office crying.

137.     After this incident, Flanagan baselessly threatened Morris's new employer that he would

sue them for stealing proprietary information if they followed through with her offer, and fearing

legal action, the new company in fact rescinded Morris's offer (which was Flanagan's explicit

intention). She was thus left without a job at all. The DiscGenics employees who had witnessed

Flanagan's retaliation firsthand learned their lessons about what could happen to them. From

then on, employees did not notify DiscGenics of their next employer or even to what state they

were moving.

138.    Chi Lo was another of the six woman who sought to resign from DiscGenics during this

time period. Lo had just given birth when she tendered her resignation. Poole worried that Lo did

not want to work at the company because Silverman's experience as a new mother was widely

known amongst employees. In the hopes of remedying any such expectations, Poole suggested to

Wynalek that the company offer Lo a flexible work arrangement so she could more easily work

from home. Wynalek acquiesced and Lo agreed to return to the company after her maternity

leave.

139.    Silverman continued to attempt to protect her female subordinates from Flanagan's

behavior. In January 2021, a female employee, Erin Scull, who had just finished her PhD,

approached Silverman and stated that she was distraught after Flanagan made a joke about oral

sex in a meeting. Scull told Silverman that the joke had made her very uncomfortable and she

was scared to be in the same room as Flanagan moving forward. Silverman felt awful that she

had no way to assuage Scull's fears; all she could do was advise her to avoid being in the same

room as Flanagan, and to take the long way around his office to avoid inadvertent encounters

with him.

140.    In March 2021, Flanagan told Poole that he had attempted to recruit his neighbor, an

older man, to fill the role of CSO. Poole was flabbergasted because not only was Flanagan's

neighbor unfamiliar with the therapy that DiscGenics was developing, but he knew that

Silverman had been waiting – and qualified based on her merits – for this position. Poole also learned that Flanagan spoke with at least one other person, another former male colleague of Dennie's, in late 2020, about filling the vacant role of CSO.

141.    In April 2021, Dennie told Poole she had had enough and was resigning.[19] This, along with the fact that Flanagan was actively recruiting underqualified men for the position of CSO, was the last straw for Poole; he knew he had to escalate the complaints about Flanagan. He informed Silverman he felt he could no longer manage the situation alone and asked her if she was willing to accept the risks of escalating her claims. Silverman agreed. The situation at work had become untenable.

142.    On April 26, 2021, after Dennie had officially tendered her resignation, Poole called Foley to explicitly provide examples of the hostile work environment he had observed firsthand at DiscGenics, and which by now was clearly resulting in the resignations of the company's few female employees. During the conversation, Foley expressed surprise but appeared somewhat receptive. Poole told Foley that "[Flanagan] has always been bad and he's just getting worse during the time I've been here." Foley acknowledged to Poole that he had seen "warning signs" but stated that "deep down [he thinks] Flanagan is a good person." He asked Poole to help with "contingency planning."

143.    On April 27, in light of the fact that Dennie, the Director of Clinical, had just resigned, Poole suggested to Flanagan that Silverman step in to help with the clinical data analysis, to which he agreed. Poole texted Foley to share that Flanagan had agreed to this and that this was a

---

[19] On May 7, 2021, Poole conducted Dennie's exit interview. Dennie shared that Flanagan and Wynalek had fostered such an untenable environment that she had made up her mind to resign within the first couple of months of her employment. She told Poole that she had only stayed at the company a full 12 months to protect the integrity of her resume. She again reiterated that the clinical timelines that Flanagan was presenting to investors and shareholders were unlikely. Poole decided not to document this discussion because he knew Dennie was scared of retaliation from Flanagan, so he relayed the message verbally to Foley

"good first step" toward better inclusion of Silverman. He urged Foley to "make sure that Flagg [Flanagan] acknowledges [Silverman's] efforts and shows the right level of appreciation."

***Poole Engages in Explicit Protected Activity***

144.    Apparently, Foley called Flanagan that same night to discuss Silverman's role in the clinical data analysis, because first thing the next day, Flanagan angrily summoned Poole to a meeting. Flanagan instructed Poole that "under no circumstances" could he ever speak with a board member again without Flanagan's permission. He explicitly berated Poole for his efforts to include Silverman in business activity, even though Silverman was now the only person at the company with strong enough clinical and analytical skills to do the analysis. Poole was extremely distraught by Flanagan's efforts to silence him, prohibit Silverman's inclusion in business activity, and stop the transparent flow of relevant business information between himself (the CFO) and the Board of Directors. Poole therefore responded, "I am the CFO, and if I can't speak directly with a Board Member without your [Flanagan's] approval, then we have a problem."

145.    That evening, Poole and Dennie were texting when Poole mentioned that he had inadvertently told Flanagan she was building a house in the area. Dennie responded: "okay. If you could just not tell him where I'm building a house please." Poole realized that Dennie was worried about Flanagan harassing her, as he had done to Morris when she resigned. Poole again spoke with Foley on the phone, both to confirm that it was acceptable for Poole to still contact him, and to share Dennie's fears about Flanagan harassing her at her home. Foley responded, "woah, that's bad."

146.    On the evening of April 29, Flanagan summoned Poole to a Zoom board meeting he was leading. Flanagan began the meeting by asking Poole to share the concerns he had raised to

Foley with the group. Poole initially shared vague concerns about a "hostile work environment," and that he believed some of the root causes of employee turnover were related to intimidation and bullying in the workplace. When Flanagan pressured him for more information, Poole unambiguously shared his concerns about Flanagan's continual use of sexually explicit commentary and jokes in the office.[20] In response, Flanagan admitted he had made sexual jokes in the office, but argued that he did so only in the presence of select audiences. Foley reprimanded Flanagan, and told him he should "never do this in the office," irrespective of the audience. In a sarcastic tone, Flanagan promised Poole he would stop, "now that I know how sensitive you are." Flanagan instructed Poole to send him any future complaints "in writing," but after Foley replied that that was a "terrible idea," the board then agreed to manage the situation offline.

147.    During this meeting, for the first time, Flanagan recommended that the company hire a new employee solely dedicated to HR, which would diminish Poole's authority and standing at the company.

***Silverman Engages in Explicit Protected Activity***

148.    After the meeting, Poole told Silverman that some of her concerns had been disclosed at the meeting, and suggested she contact Foley directly, since she had experienced Flanagan's harassment firsthand.

149.    Thus, on April 30, 2021, Silverman spoke with Foley by phone. She gave him a firsthand account of the discrimination and harassment that she, and other female employees, were constantly subjected to at DiscGenics.

---

[20] Poole was careful not to mention Silverman's name as one of the originators of the complaints at this time, as he did not want to subject her to Flanagan's near-certain retaliation in response.

150.    After the call, Foley called Poole to ask if everything Silverman told him was true. Poole told Foley that it was all true, as far as he knew, and that many of these complaints had formed the basis for the claims Poole had raised the evening prior. Foley responded that he had not realized "how bad" Flanagan's conduct had been.

151.    Later that evening, Poole and Foley had another phone conversation. Foley asked for more details about Flanagan's conduct, and expressed concern that Poole might resign. Poole assured Foley that he would remain at the company so long as Foley could commit to ameliorating the sexism and harassment. Foley admitted that he could not "get rid" of Flanagan, but pleaded with Poole to stay.

152.    The next day, May 1, in response to Foley's plea and his seemingly good intentions, Poole proposed to Foley that if they could not remove Flanagan from his role, they must at least limit his interactions with female employees as much as possible, including ensuring that no female employee had to meet with Flanagan alone.

153.    Poole also suggested that the company should promote Silverman to CSO, as she had been performing the role for many years without the requisite compensation or title. In addition, he suggested that the company appoint a woman to the executive team and to the board of directors, so as to provide a safe place for women to escalate concerns of this nature if they were to happen again.

154.    Foley told Poole that these requests were reasonable, and committed to them. He suggested that he, Poole, and Silverman meet with Najeeb Thomas, the fifth board member. Silverman was on vacation with her family that day, so they scheduled the meeting for the next day. Meanwhile, Poole met with Thomas, later that same day, to bring him up to speed generally.

Thomas objectively listened to the complaints, but was noticeably cautious not to acknowledge wrongdoing by the company.

155.    The next day, the four met via Zoom, as planned. Silverman again gave a detailed account of the inappropriate behavior, harassment, and discrimination that women at DiscGenics were constantly subjected to by Flanagan and Wynalek. Silverman explained that because of Flanagan's position at the company, as well as his aggression and frightening temper, female employees were afraid to complain out of fear of retaliation against them. Foley and Thomas both acknowledged the complaints, and admitted to personally witnessing Flanagan's conduct. Foley ironically even remarked, "if I said some of the stuff that Flagg does, my wife would cut off my you know what."

156.    During this meeting, Thomas asked Silverman why she had stayed at DiscGenics for so many years. Silverman responded, "I always thought if I kept my head down and worked hard, that it would eventually get better." Thomas remarked that Silverman sounded like "an abused spouse."

157.    Foley asked Poole and Silverman not to "put anything in writing," but they should "trust that changes would occur."

158.    Foley told Silverman that the company would make specific changes, including: (1) adding a woman to the Board; (2) requiring executive leadership to undergo sexual harassment training; and (3) providing Silverman with a long-deserved promotion to CSO in order to bring a woman onto the leadership team. Foley requested Silverman provide him with a list of achievements and qualifications, which he could use to substantiate her promotion, and reiterated that she was performing well.

159.     Silverman told Foley she had asked to be promoted to CSO numerous times; Foley expressed surprise, saying he was unaware of these requests. During this conversation, he repeatedly stated, "but *you are* the CSO," in reference to the breadth of work Silverman was engaged in at DiscGenics. Silverman simply replied, "No, I am not; not in title or in pay." Foley acknowledged this was true.[21]

160.     The next day, Monday, May 3, 2021, Foley sent Poole a text message describing how he had had a long conversation with Flanagan that weekend about his conduct at work. Poole replied that he appreciated how Foley was addressing their concerns, and that both he and Silverman were prepared to follow his lead, as they wanted what was best for the company.

***The Company Retaliates Against Poole by Removing his HR Duties***

161.     Contrary to Foley's promises, not a single one of Poole's suggestions were implemented.

162.     On May 4, 2021, just two days after Silverman's meeting with Foley, Thomas, and Poole, and less than a week after Poole had attended the board meeting, Wynalek summoned Poole to an in-person meeting. At the meeting, Wynalek handed Poole a memo dated April 29th titled "Input and Directives," which purported to include "notes from discussion with Jeff Poole." The memo emphasized that Wynalek and the board were "working directly with Flagg on follow-up action to the issue (i.e. executive coach)." Without explicitly discussing Flanagan's discriminatory or sexist conduct, the memo purported to summarize the discussion by stating that, "Jeff raised allegations of hostile work environment and fear of some employees from Flagg office behaviors"; that "Kevin [Foley] advocated for Flagg to work with an executive coach as a positive and proactive means of addressing the raised issue/s"; and that the board had appointed Wynalek to co-lead HR with Poole, pending the hiring of a certified/experienced HR Manager.

---

[21] On May 14, 2021, when Silverman provided Foley with her list of achievements over the last decade at DiscGenics, Foley responded, "impressive, of course. I will digest and let's discuss."

163.     The official board meeting notes omitted any reference to Poole's complaints about Flanagan's sexually explicit jokes at work or Foley's reprimanding of Flanagan during the meeting.

164.     In a passive-aggressive chastisement to Poole for raising his concerns to Foley, the memo stated that Poole must have "transparent communication with Flagg," as Poole was "a direct report of his." The memo also sought to limit Poole's interactions with female staff by instructing him to "focus his regular one-on-one activity with his assigned direct reports only." Finally, the memo instructed that Poole was no longer to perform any HR duties without Wynalek in the room to supervise.

165.     It was apparent to Poole that the company was not only retaliating against him by removing his HR responsibilities but also seeking to actively thwart employees from raising concerns. It was also clear that Foley had failed to share any of the contents of their previous discussions with Wynalek, or that if he had, no meaningful results were achieved, either by neglect or by design.

166.     Poole immediately objected to the memo. He told Wynalek that employees needed a safe place to voice their complaints without fear of retaliation, and that the directives in the memo would significantly hinder that.

167.     Poole also told Wynalek that it seemed like he was being punished for speaking up, and that it would not help the company to cut Poole off from employees or stop him from improving company culture. In response, Wynalek told Poole not to worry, and that DiscGenics was planning to hire an employee specifically tasked with HR duties.

168.     That same evening, Poole called Foley to relay his conversation with Wynalek. Foley told Poole that he knew about the memo, and bizarrely expressed that it had been given to Poole

to somehow "buy time," though he did not explain for what. Foley told Poole that, contrary to the memo and to Wynalek's instructions, he *could* continue to have one-on-one conversations with employees, and he again pleaded with Poole not to leave. Foley also said that if the company hired another HR employee, it would only be to increase capacity, and that the new employee would report to Poole. Foley ended the conversation by reassuring Poole that the company would make the necessary "material changes" to improve the work environment, and that they continued to rely on Poole's help.

169.    Foley urged Poole to escalate any new concerns his way, and asked him to include Wynalek in any such communications.

170.    Even though Wynalek had been a co-offender on many occasions and Poole and Silverman were disgusted with him for never speaking up or disengaging from Flanagan's sexist banter in the past, he was much less unhinged than Flanagan. Poole felt he had no choice but to accept a bit of a compromise, especially since Wynalek was actually in the office and Foley was not; Poole thought Foley was trying to leverage Wynalek to help improve the toxic work environment from within.

171.    Around this time, in early May 2021, Poole was on a call with Flanagan to discuss the prospects of regulatory approval of DiscGenics in the UK, enabling them to sell their product there and dramatically increase their potential market.[22] During the call, Flanagan misrepresented crucial facts about the company to the potential business partners; later, he also misrepresented facts from that discussion to the Board in a debriefing. Poole emailed Wynalek to report the misrepresentations, fearing they could become detrimental to shareholder interests; Poole stated

---

[22] Poole was infuriated because after the conversation, Flanagan told the board that it was "a huge opportunity." In reality, the consultants on the call discreetly mocked DiscGenics and said, "maybe you guys should try to get a tourist visa first and see how difficult that is before you try to set-up an entity here."

if Flanagan was going to lie to shareholders, he could not participate in fundraising, because the misstatements posed too much of a liability risk for him as CFO. This issue was independent of the claims of discrimination and harassment, but was part of Poole's efforts to "stay the course" as Foley had advised him with respect to his financial duties as CFO.

172.     In another separate but related event in May 2021, Poole became frustrated by Flanagan's repeated efforts to prohibit Silverman from joining critical business meetings with third-party consultants. Silverman's expertise was crucial to fruitful discussions about laboratory activities, and Flanagan was deliberately silencing her during, or at times completely excluding her from, these meetings. Poole felt that Flanagan's conduct was detrimental to the company and its investors. After one such meeting with Latham BioPharm, an industry-leading quality control company that was providing scientific consulting, Poole sent an email to a representative from Latham requesting a private discussion to seek advice on quality policies and procedures for the research lab. Poole hoped to talk to Latham without Flanagan present to derail the discussion, and to include Silverman in the conversation, since the research lab was her responsibility and involved her team, and she was clearly the individual with the most relevant knowledge on the topic.

173.     Additionally, sometime that month, in an email that Silverman had been copied on, Wynalek referred to himself and Flanagan as "the C-Level Boys", making it clear that not only had no promotion ever been intended for Silverman, but also that no one was taking their concerns seriously.

174.     On May 12, 2021, Wynalek scheduled a meeting with Poole to discuss the "Input and Directives" memo. He repeated that Poole was not to conduct one-on-one meetings with employees.

175.     Poole thus called Foley that evening to seek clarification. However, Foley had changed his tune. For the first time, he agreed with Wynalek that must Poole follow the directives. It appeared that perhaps he had been threatened somehow, because he later became angry, telling Poole, "I will try to help you, but if anyone comes after my net worth… if lawyers get involved… I will say that I never knew about any of this… and you guys are on your own."

176.     Poole and Silverman continued to believe that Foley was on their side, and they wanted to ensure that he remained supportive of their efforts. Though the reasoning was unclear to them, they complied with Foley's request not to put anything in writing.

177.     Over the course of the next few weeks, Poole experienced sleepless nights and high levels of anxiety. On the one hand, he had been privately assured by Foley that the company would address Flanagan's behaviors, and that Poole should help stabilize the staff. On the other hand, he had officially been reprimanded and prohibited from meeting with many employees who had confided in him. There was no evidence of any systemic changes being made, other than a vague promise that Flanagan would receive professional coaching (which would take months for results to materialize, if ever). Poole was confused by the mixed messages from the executive team and board members. Despite being told explicitly not to have discussions with Foley, Poole received a text message from Foley as late as May 19 saying, "please feel free to contact me anytime," and Foley called Poole on May 27 to discuss general business.

***DiscGenics Further Retaliates Against Poole by Abruptly Terminating his Employment***

178.     On June 4, 2021, at their daily meeting, Poole shared concerns about the exit valuations that Flanagan had often quoted in previous investment rounds, with Flanagan and Wynalek. Poole was concerned that several clinical timelines were unachievable and that as a result, the likely current valuation of the company was only a fraction of what Flanagan generally told

potential investors. Though the meeting seemed cordial, it was obvious to Poole that Flanagan

and Wynalek had no interest in considering his claims or transparently relaying his findings.

Flanagan simply called the findings "interesting" and ended the Zoom call by asking Poole to

forward his PowerPoint slides to them.

179.    Later that afternoon, Wynalek invited Poole to an in-person meeting, where he abruptly

informed Poole that his employment was terminated, effective immediately, for cause. During

the meeting, Wynalek repeatedly stated, "I hate that I have to do this." Wynalek described

approximately three purported deficiencies in Poole's performance, all of which were complaints

he was hearing for the first time, let alone being disciplined for.

180.    The first was that Poole had purportedly shared the fact that Flanagan had not completed

the mandatory sexual harassment training.

181.    The second was that he had sent emails to Latham Biopharm from his personal email

account and essentially attempted to "manipulate" Latham. This was yet another example in

which Flanagan's exclusion of Silverman had been to the company's own detriment and in fact

Poole's efforts had been to the benefit of the company.

182.    The third was an especially bizarre accusation that Poole had shared "confidential

information" with Silverman. The "confidential information" that Poole had allegedly shared

was that Flanagan had received the Covid-19 vaccine, which was clearly not confidential

because Flanagan had previously announced this in all-employee meetings and regularly

discussed openly the fact that he was vaccinated.

183.    Wynalek also told Poole that the board had conducted its own investigation into

Flanagan's behavior and had found Poole's and Silverman's complaints to be unsubstantiated.

Specifically, Wynalek purportedly contacted Dennie, who he claimed had denied expressing

fears that Flanagan would harass her at home. Of course, Dennie's later ostensible retraction was consistent with the pattern Wynalek and Flanagan had cultivated in which even former employees were afraid to complain; it made no sense why this retraction would somehow outweigh the original complaint, which was in writing.

184.    Wynalek also highlighted Poole's lack of witnesses in his prior complaints as a reason for finding the complaints to be unsubstantiated; however, Poole had been hesitant to give the board the names of all the witnesses in Flanagan's presence, due to the culture of retaliation, and because some individuals had directly requested that Poole refrain from identifying them.[23]

185.    Immediately after the meeting, Wynalek sent Poole to turn in his computer, and he was asked to leave the building. Poole was not given an opportunity to respond to any of the allegations before being terminated.

186.    This termination was a blatant breach of Poole's Employment Agreement, which required "providing 45 days to cure any deficiency" in the event of "Termination for Cause." The company offered Poole a three-month severance and an extension of stock options, which were inconsistent with his Employment Agreement terms for "Termination for Cause" or a "Termination without Cause." In exchange, Poole would have to release all his claims against the company and extend his non-compete and non-solicitation agreements.

187.    The company has since further retaliated against Poole by withholding all subsequent shareholder notifications, in violation of the private Shareholder Agreement between the parties.

---

[23] On August 30, 2021, after his termination, another female employee described to Poole that she "couldn't continue to work for a company that [she] felt, especially as a woman, didn't have [her] best interests at heart…it felt like it was a sinking ship." She soon became one of the 11 female employees who resigned from DiscGenics in late 2020 to late2021.

***Silverman is Also Retaliated Against and Given a Sham Performance Improvement Plan***

188.    After Poole was fired, DiscGenics hired a third-party consultant, Christine Wzorek, to assume HR duties, ostensibly pending the full-time hire. Wzorek instructed Silverman to resume reporting to Wynalek. Silverman requested to report to Foley, as Dennie had done, but Wzorek told her that was "not appropriate at this time." Thus, Silverman was forced to report to one of the very men she had complained about for sexually harassing behavior.

189.    Wzorek also reported to Wynalek, leaving Silverman with no avenue for complaint.

190.    On June 8, 2021, Silverman emailed Wynalek with her complaints of gender discrimination and harassment. She wrote that she had previously escalated her complaints of sexual harassment to Foley and Thomas, and that five of the six people who had resigned from DiscGenics over a six-month period that spring were women. In a lengthy email, she detailed many of the examples included herein, and stated that Flanagan had created a "hostile work environment, especially for women, based upon the inappropriate sexual behavior, jokes and comments." She further wrote:

> Since bringing up these allegations, I have been excluded from key elements of my job, including two major discussions with strategics (one of which was centered on an R&D project with [a global company]) and removal from discussion for analysis of the upcoming clinical data, which will be unblinded any day now.

191.    Lastly, she expressed concern that Poole had been suddenly fired immediately after raising the very same concerns, and that she was now worried about her own future at the company, having raised the same complaints.

192.    Wynalek promptly responded, "[a]ppreciate your candor on this. Kevin [Foley] and Najeeb [Thomas] have acknowledged your input and investigation is active on claims as discussed on Friday."

193.    Silverman had in fact begun to experience suspicious and exclusionary acts which she could only assume were tied to her April and May complaints of discrimination. She had been removed from meetings with strategic partners (including a meeting with the R&D team), which she previously would have attended; she had been excluded from all meetings related to a clinical trial, despite being a key team member and the person who was going to analyze the data; the weekly meetings she attended with Flanagan and Wynalek – which had previously included strategy discussions and company-wide decisions – had been reduced to mere logistical matters. Silverman suspected other meetings were being set up and held without her. Though she did not mention it in the email to Wynalek, she also noticed that Flanagan had begun interrupting her whenever she was speaking during meetings, and he had begun to contact her reports directly with questions, circumventing her leadership and authority.

194.    Three days later, on June 11, Silverman's concerns were validated when Flanagan sent her an email instructing her to cancel her travel plans for an upcoming conference she had been signed up to attend for over six months. Silverman had been planning to write an article in *JOR Spine* regarding unmet medical needs in spine therapeutics with a number of DiscGenics' lead Clinicians conducting their clinical trials. Silverman had intended to interview these clinicians at the conference, and report to the clinicians at the conference a technical update on some of the studies, while Flanagan would report an update on the business.[24] These clinicians and doctors were often selected to give presentations at conferences, and known as thought leaders in the industry; they were hard to get on the phone, since they were so busy, which is why DiscGenics had paid for Silverman and Flanagan to attend the conference to connect with them.

---

[24] Silverman often attended conferences to make sure DiscGenics' name was known and associated with good science, and also to build relationships with key academics and doctors.

195.     Flanagan provided no explanation for why Silverman was suddenly being excluded from the conference.

196.     On June 15, 2021, Wynalek and Wzorek called a sudden meeting with Silverman. Silverman assumed the purpose of the meeting was to discuss her complaints of sexual harassment from her email one week prior. Wynalek instead informed Silverman that she was being put on a Performance Improvement Plan ("PIP") [25] and started reading from the document, along with Wzorek.

197.     Silverman listened respectfully and calmly, even though she was in absolute shock. When Wzorek finished reading the PIP, Silverman said she would review and asked about her email from the previous week. In response, Wynalek and Wzorek said that Silverman would receive a separate written response regarding the investigation, which was "ongoing." Then, however, Wynalek added that "once again, this PIP is based off of the findings, the investigation, which basically was a six-week initiative following the claims that Poole and yourself brought to the board that were thoroughly investigated."

198.     Silverman was flabbergasted. She asked Wynalek, "so I received a performance improvement plan because I approached the board with concerns?"

199.     Wynalek quickly corrected himself and, reading from the written PIP stated, "no, no as we iterate here, it's because of things you did in relation to attempting to block Latham, the interchange and use of confidential information that was not within your purview to receive or use." Silverman did not know what emails Wynalek and Wzorek were referring to but objected that she had no control over emails that were sent to her and that it seemed unfair, but calmly asked Wynalek and Wzorek to continue.

---

[25] Wynalek subsequently sent the PIP to Silverman in an email with the subject line "investigation" even though the email contained no documents or information related to any investigation.

200.     Wynalek then admitted that the PIP was related explicitly to her claims of gender-based

failure to promote:

> I'll be real frank, Lara, I'm going back. We went through the 4/29 claims and the
> way those things were linked, and were attempted to be used basically as a lobbying
> effort for your promotion to CSO came out of this. . .  the way things were presented
> in information that's been put back and forth was, some of this being set up in an
> attempt to influence.

201.     Silverman could no longer contain her outrage to these accusations, especially the fact

that she was engaging in protected activity as part of a "lobbying effort for [her] promotion to

CSO." The claim was not only untrue but illogical: if her goal had been to be promoted to CSO,

why would she complain about the very executives responsible for that decision?

202.     She exclaimed to Wynalek and Wzorek that she had made those complaints in an effort

to place a woman in a leadership position so that the "uncomfortable situation" would end. She

continued:

> We've lost five women in six months. I just want to bring a woman to a leadership
> position, hire somebody else then. I don't care. The point is to get a different voice
> at the top. So we don't keep losing women and they don't keep coming to me with
> these concerns about inappropriate jokes and inappropriate comments. That was the
> objective here. And if you guys think otherwise we have a bigger philosophical
> problem. This is very disappointing.

203.     The conversation ended by Wzorek telling Silverman that she was "very hopeful that the

performance improvement plan will be successful" and that she was "here for [Silverman] as a

resource."

204.     After the call, Silverman reviewed the PIP document. As she suspected, it lacked any

specific information regarding her purported performance failures, and instead contained only

vague allegations of wrongdoing. Nor was there any measurable improvement identified (such as

completing a specific task or activity) or timeline for remediation.

205.    The PIP included three complaints. First, it stated that Silverman "actively worked to impede business efforts" by:

> Undermining internal direction from both executive management and Quality staff on initiatives to implement and adapt GMP 'best practices' within the company laboratories by blocking behaviors directed toward Latham Biopharm and Quality staff.

This was a clear lie regarding Silverman's work in attempting to implement GMP best practices within the company's laboratories. Silverman worked actively to implement GMP best practices for future manufacturing processes and respectfully brought up concerns regarding whether extra expense and personnel time was needed or appropriate for each state of development.

206.    Second, the document faulted Silverman for:

> Seeking, receiving, and using confidential information outside of her role, responsibility and purview to obtain information for her benefit, to thwart business activity, as well as regulatory-compliance requirements and other initiatives of the organization. This was accomplished by achieving internal alliances with individual employee(s) and board of director member(s) based on a false trust and intent to mislead for personal gain and advancement.

To the contrary, Silverman was never provided confidential information outside the purview of her responsibilities at DiscGenics. She never worked to "thwart business activity," especially since she had dedicated a decade of her life to the company. She always worked in the best interest of the company in order to drive up the value of its product. There was no conceivable basis for this complaint other than transparent retaliation for having raised her concerns with Poole, Foley, and Thomas regarding gender discrimination at DiscGenics.

207.    Finally, and perhaps most shockingly, the PIP claimed that Silverman had engaged in "[b]ullying and eliciting a destructive culture of direct reports, peers and indirect team members." This was also a blatant lie. Throughout the 10 years that Silverman worked at DiscGenics, she built a strong and loyal team of direct reports, peers and team members, as

evidenced by the extremely low turnover rate of her direct staff. She constantly worked to improve the project management program, establish a useful employee review system, supported the implementation of online training programs, encouraged the sending of staff to conferences and other career enhancing activities, engaged in one-on-ones with her direct reports as needed, and set up special fun activities such as barbeques, Zoom happy hours and volunteer events. If anything, Silverman maintained extremely positive relationships with her colleagues in spite of Flanagan's and Wynalek's constant criticism and mocking of her.

208.    The PIP outlined "performance to be improved" which included directives such as:

- You must create and promote a positive work team environment for not only your direct reports, but also with upper management and any individual who interacts with you on the job site;
- You understand that it is inappropriate to share personnel information, frustrations, and/or concerns about company direction and initiatives with employees, consultants, vendors, and peers;
- You must better understand and apply, through training, the characteristics and skills which depict a successful supervisor, manager and leader in the organization.
- Under no circumstances are you to work to create internal alliances to disrupt, impede, derail or slow down business initiatives set by the Board of Directors and Executive Leadership.
- Under no circumstances are you to work to create internal alliances for personal gain and advancement in the company where direction from the Board of Directors and/or Executive Leadership has not been formalized, announced, and/or posted.

209.    The message of these directives was clear to Silverman: stop raising concerns about discrimination and harassment of female employees at DiscGenics.

210.    The guidance within the PIP would have also restricted Silverman's internal communications with direct reports or colleagues, undermining her role as a trusted leader in the company and eliminating another channel for employees to safely raise complaints of this nature. These guidelines and restrictions were stunningly similar to those previously placed upon Poole after he had escalated concerns to the board.

58

211.    That evening, Silverman called Foley. She asked him how she should interpret the PIP.

He encouraged her to again "keep her head down" because we are "dealing with a lot of different

personalities." He said Silverman should "continue to do good work." He was not able to provide

any examples or any knowledge that Silverman's performance was lacking in any way.

***The Company's Sham Investigation and Concurrent Admissions***

212.    From June 15 through June 23, 2021, Wzorek ostensibly conducted an "investigation" to

determine the validity of Silverman's complaints of sexual harassment and gender

discrimination. The details of the investigation were later provided by DiscGenics as part of their

response to Plaintiffs' UALD charges of discrimination: nine employees were interviewed, seven

of whom were men and only two of whom were women. Neither Silverman nor Poole were

interviewed. Other than Mangum and Erickson, none of the individuals interviewed were heads

of departments or reported to Flanagan or Wynalek.

213.     Of the two women who were interviewed, one, Nicole Bowen, is a currently employee

who reports directly to Flanagan, and the other, Erin Scull, is personal family friends with

Flanagan. When asked about company leadership, the documented response is that the "female

employees declined to comment on discomfort with casual conversation of leadership."  The

company chose to interpret this comment as a conclusion that no relevant issues existed.

214.    On June 16, 2021, Silverman received a letter from HR, purportedly written by Flanagan

– though the legal phrases within the letter indicate that it was ghostwritten by his attorneys –

acknowledging some of his behavior and promising to be better. Flanagan starts by writing that

he denies he has "discriminated in any way against female employees, including Lara and others

she identified in her allegations." He also states that:

> I may have engaged in locker room banter from time to time, and in doing so, I may
> have caused some employees to feel uncomfortable. I assure you, and will assure

others as appropriate, that such discussions will not occur again. But I would like to again emphasize that I have never actually discriminated against any female employee in terms of promotions, compensation, or professional opportunities. Moreover, although my banter has not always been perfect, I have never actually touched a female employee inappropriately or made any improper propositions. Finally, as I'll explain below with the help of my legal counsel, mothing I have done could possibly be characterized as legally actionable sexual harassment.

215.   Flanagan went on to deny most of the specific allegations Silverman made against him, however, he stated that "there are a few that may have occurred to some degree" and "over the course of ten years I did tell some inappropriate jokes," but that he didn't "realize that Lara was offended by occasional sexual banter." Flanagan also admitted that had had "often referred to women as 'girls', and ha[d] not always appreciated that using that term might be offensive to some women," but he was "resolved not to do that again."

216.   Flanagan also denied that he had retaliated against Silverman in any way and that she was excluded from a "discussion with strategies" because it was a "C-level meeting that she would not be part of anyway."

217.   In conclusion, Flanagan chose to emphasize that he had "not abused any female employee, touched a female employee improperly, or made any sort of inappropriate advance to a female employee."

218.   The letter did not address DiscGenics' failure to promote Silverman to CSO, nor the adverse actions that both Poole and now Silverman had suffered in open retaliation for their complaints of gender discrimination.

219.   From this letter, DiscGenics made its position clear. The company hoped to bury the issues and keep Flanagan as CEO. The decision underscored how little the company valued Silverman, which was a severe blow to her mental stability given her extreme dedication and passion for DiscGenics over the previous decade.

220.    After Silverman's meeting with Wynalek and Wzorek, and despite Flanagan's letter which proclaimed that DiscGenics was not retaliating against her, even more of Silverman's job functions were removed.

221.    For instance, after years of being involved in clinical trial design and analysis of clinical results, Silverman was told that she would be prohibited from seeing the newly unblinded clinical trial results, even though a third-party consultant had told the company that Silverman would be the most appropriate individual to analyze the data following Dennie's departure. Not only had Silverman been intimately involved with designing and executing the study, but the only alternative was to bring on a consulting firm and have them do the work, which would take much more time and expense.

222.    Flanagan continued to make a point of ignoring Silverman's input and presence in meetings, despite her supervisory authority, and instead openly deferred to her reports.

223.    With every week that passed, Silverman was more and more removed from activities at the company, which caused her severe anxiety and sadness. She found that no one was inviting her to any meetings or discussions, and when she was invited, Flanagan and Wynalek rudely interrupted her and disregarded her opinion or insight entirely.

224.    Silverman felt like the last 10 years of her work was slipping from her hands. She understood that her relationship with the company was beyond repair and that she did not have a single ally to fight the discrimination or retaliation.

225.    For the first time in her career, in spite of her hard work and dedication, she began to experience extraordinary self-doubt. She questioned her own abilities and felt ashamed and guilty about having put her job at risk, especially as a mother and income generator for her family. As a result of the severe anxiety she felt, she experienced heart palpitations and serious

insomnia, sometimes losing entire nights of sleep. She was unable to pay attention to her

personal life, became distant from her family, and experienced severe panic after working hours.

She lost interest in normal activities and was prone to crying easily.

226.     To add insult to injury, Wzorek repeatedly harassed Silverman to sign the PIP, despite

Silverman's objections that the critiques were unspecific and it was unclear what exactly she was

supposed to change.

***Silverman Resigns from DiscGenics as the Work Environment Becomes Intolerable***

227.     Silverman found herself in an impossible position as she was being treated increasingly

worse by Flanagan and Wynalek, who had long given up any pretense whatsoever of respecting

or valuing her, and removed from more and more of her duties. Now that she knew the board's

position, she had no avenue whatsoever for recourse.

228.     Consequently, on June 25, 2021, Silverman resigned from her position. She explained

that "leaving is quite obviously the only option remaining for me." Her last day was July 1, 2021.

229.     Within the next four months, four more women resigned from the company.  In total, 11

women left DiscGenics between November 2020 and November 2021 – nearly one-third of

DiscGenics' staff, and approximately 65 % of the women.

230.     To this day, there has never been a single woman on the board or the executive leadership

team. Flanagan and Wynalek remain in their positions, having suffered not a single repercussion.

***DiscGenics' Post-Employment Retaliation Against Plaintiffs***

231.     As an owner of 2,500 shares of DiscGenics Series C preferred shares which were

purchased by Poole in August 2020, Poole received shareholder notifications throughout the

entirety of his employment with Defendant, as required by the shareholder agreement between

Poole and Defendant. Since the termination of his employment, Poole has not received a single shareholder notification.

232.     Meanwhile, upon information and belief, other shareholders have received at least four regular quarterly notifications since June 2021, including one as recently as August 18, 2022. This indicates that Defendant has deliberately withheld these notifications from Poole, as a retaliatory measure.

233.     In or around September 2021, Flanagan told third party consultant Chris Lyons, without any basis whatsoever, that "the more [he] learned, the more [he] was convinced that [Plaintiffs] were having an inappropriate relationship."

234.     On August 12, 2022, Defendant threatened to file "counterclaims for defamation and/or tortious interference" against Plaintiffs on the basis of unspecified statements by Plaintiffs. When asked to identify the allegedly defamatory statements, Defendant failed and refused to do so.

**FIRST CAUSE OF ACTION:**
**Discrimination in violation of Title VII**
***On Behalf of Plaintiff Silverman***

235.     Silverman repeats and realleges all facts set forth above.

236.      DiscGenics unlawfully discriminated against Silverman in the terms and conditions of her employment on the basis of her gender, including, *inter alia,* by under-paying her because she was a woman, by creating a work environment so hostile that she was forced to resign, in violation of Title VII.

237.     The discrimination was severe.

238.     DiscGenics' unlawful discriminatory acts created an intolerable work environment, which would have forced any reasonable person to resign.

239.    DiscGenics' unlawful discrimination caused Silverman to suffer emotional and psychological distress, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering and economic damages, including lost wages and benefits.

240.    DiscGenics acted willfully, with malice and/or reckless indifference to Silverman's rights, entitling Silverman to an award of punitive damages.

241.    Therefore, DiscGenics is liable to Silverman for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

**SECOND CAUSE OF ACTION:**
**Retaliation in violation of Title VII**
***On Behalf of Both Plaintiffs***

242.    Plaintiffs repeat and reallege all facts set forth above.

243.    DiscGenics unlawfully retaliated against Plaintiffs after they engaged in protected activity by, *inter alia,* excluding Plaintiff Silverman from meetings and discussions, ignoring her complaints of discrimination, removing her direct reports from her supervision, and by, *inter alia,* firing Plaintiff Poole.

244.    The retaliation was severe.

245.    DiscGenics' unlawful retaliatory acts caused Plaintiffs to suffer emotional and psychological distress, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering and economic damages, including lost wages.

246.    DiscGenics acted willfully, with malice and/or reckless indifference to Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages.

247.    Therefore, DiscGenics is liable to Plaintiffs for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## DEMAND FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment for Plaintiffs and against Defendants, in amounts to be determined by the finder of fact, on the First and Second Causes of Action, awarding compensatory and punitive damages, attorney's fees, and costs, and granting such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Plaintiffs demand a trial by jury.

Dated: Brooklyn, New York
        October 5, 2022

Respectfully submitted,

Julia Elmaleh-Sachs
Susan K. Crumiller
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
Julia@crumiller.com
Susan@crumiller.com
*Admitted Pro Hac Vice*

Lauren I. Scholnick
Strindberg Scholnick Birch Hallam Harstad Thorne
40 South 600 East
Salt Lake City, Utah 84102
(801) 359-4169
lauren@utahjobjustice.com